**STATE OF FLORIDA ex rel. BOARD OF SUPERVISORS OF SOUTH FLORIDA CONSERVANCY DISTRICT v. MILLARD F. CALD-WELL, Governor, et al.**

35 So. (2nd) 642                                            January Term, 1948
March 16, 1948                                                        En Banc
Rehearing denied June 24, 1948

*Herbert S. Sawyer, Thos. McE. Johnston, Evans, Mershon, Sawyer, Johnston & Simmons,* for relator.

*Julius F. Parker, Leo L. Foster, John T. Wigginton, T. T. Turnbull, Parker, Foster & Wiggington,* for respondent.

BARNS, J.:

The case as presented by the relator and as made by the alternative writ and respondent's answer is as follows:

South Florida Conservancy District was created in 1919 by legislative enactment (Chapter 7975) to drain and reclaim the lands within the District and render the same suitable for settlement and agricultural purposes. By the Act creating the District the Legislature levied an annual acreage tax upon the lands within the District to pay for the improvements. Bonds were issued by the district and sold to finance the works of construction.

The Legislature, in 1921, provided for and created an Agricultural Experiment Station on such lands in the Everglades as the Trustee of the Internal Improvement Fund might direct and required the Trustees to set apart lands for the station and to "provide and construct all canals, drains and other reclamation works that may be required to completely protect and secure the lands from overflow." (Chapter 8442). The Trustees could have located the station anywhere in the Everglades, but they chose to locate it in South Florida Conservancy District on Section 3, which section was then owned by the Trustees. The Acts relating to South Florida Conservancy district then provided, and have ever since provided, that the lands within the district held by the Trustees of the Internal Improvement Fund should be subject to South Florida Conservancy District taxes and authorized and directed the Trustees to pay such taxes out of any monies in their posses-

sion. Section 5, Chapter 7975, Acts of 1919; Section 6, Chapter 17258, Acts of 1935; and Section 6 (a), Chapter 20477, Acts of 1941.

The Act creating the Experiment Station further provided that the lands on which the station was established might be added to. Section 3 of the Act reads:

"The Trustees of the Internal Improvement Fund are hereby authorized and directed to set aside and withdraw from sale, any lands now or hereafter owned by the State, necessary for the use and conduct of the said Agricultural Experiment Station, and to provide and construct all canals, drains and other reclamation works that may be required to completely protect and secure the said lands from overflow. The said lands shall be as suitably and conveniently located as possible and shall not be less than 160 acres, which may be added to as the needs demand."

The lands comprising the station were added to in 1931 by conveyance direct to the State Board of Education from one Nellie D. Cannon of Section 10, immediately south of said Section 3. Both of said sections had been, by statute, subject to the taxes of the District when the works of drainage were constructed and the bonds of the district issued. Respondents deny that the taxes were lawfully assessed as to the lands owned by them and occupied by the Experiment Station. The Trustees in 1931 conveyed said Section 3 to the State Board of Education. There was no specific legislative authority for the Trustees to convey the Experiment Station lands to the Board of Education and it was and is the position of the relator that the conveyances were illegal and were made by the Trustees in an attempt to escape the obligation placed upon them by statute to pay the South Florida Conservancy District taxes upon the land.

The South Florida Conservancy District taxes consist of "Bond Tax" and "Maintenance Tax." The Bond Tax for each of the years 1935 through 1946 were levied by legislative enactment in the amount of $1.25 for each of said years. The Maintenance Tax for each of the years 1935 through 1940 was also levied directly by the Legislature in the amount of $1.75 per acre for each of said years. The Legislature in 1941

■■■■

358

authorized the Board to levy Maintenance Taxes in an amount not to exceed $2.50 per acre per year and the Board, pursuant thereto, levied $2.25 per acre for each of the years 1941 through 1946. Such levy constituted a legislative determination that the lands would be benefitted in an amount at least equal to the taxes levied. *Martin v. Dade Muck Land Company*, 95 Fla. 530, 116 So. 449. There was also a specific finding of benefits by the Legislature. *Sec. 12, Chapter 17258, Acts of 1935.* Such taxes were levied and imposed and directed to be levied and imposed upon all lands within the District, including said Sections 3 and 10. Statements for the South Florida Conservancy District taxes upon said sections for the years 1935, 1936, 1937, 1938, 1939 and 1940, were each year forwarded to the Trustees but they did not pay the statements, and finally, although requested by the District, refused to pay the taxes.

Thereupon, at the next session of the Legislature of Florida a statute reading in part as follows was thereupon enacted into law and is now the law of the State of Florida: (Chapter 20477).

"That the lands in said District used or held by, for or in connection with agricultural experiment station in the Everglades or any branch thereof shall be subject to the taxes levied by or pursuant to the provisions of this Act, notwithstanding whether the title to or ownership of such lands shall be vested in said Trustees, the State Board of Education or any other State Agency, and the Trustees of the Internal Improvement Fund are authorized and directed to pay out of any monies in their hands derived from the sale of lands or otherwise, all South Florida Conservancy District taxes heretofore levied and assessed, or which may hereafter be levied and assessed, upon such lands."

It was provided by Chapter 17258 which levied and imposed South Florida Conservancy District taxes for the year 1935 and subsequent years:

"That all taxes levied hereunder are hereby declared, and shall be considered and construed, to be special drainage assessments for benefits to said lands, and are to be used for the

purposes herein specified and authorized, . . . "—(Sec. 9, page 1102, Acts of 1935).

It is important to keep in mind the distinction between special assessments and taxes for the upkeep of government.

"Such assessment or charges are, as stated in the acts, to provide means to accomplish the purposes set out in these acts, and is a peculiar species of taxation distinct from the general burden imposed for state, county and municipal purposes in that it is a local or special charge placed upon the land situated in the drainage district to pay for public improvements proposed to be made therein, on the theory that such property thereby derives a special benefit, and therefore such charges constitute a special assessment."—Lainhart v. Catts, 73 Fla. 735, 75 So. 47.

The levees constructed by South Florida Conservancy District around the District have protected and are protecting said Sections 3 and 10 from excess waters outside the District and the canals and pumps of the District which for many weeks have been continuously operated day and night have discharged and are discharging from the lands within the District excess water which falls upon and seeps into the District. The Trustees of the Internal Improvement Fund have been and are utilizing the works of the District to discharge the function placed upon them by law to protect said Sections 3 and 10 from excess waters.

The statute is not unconstitutional and the disposition of the Internal Improvement Fund in the manner prescribed is within the discretion of the Legislature. *Trustees of the Internal Improvement Fund v. Bailey,* 10 Fla. 112, *Trustees of the Internal Improvement Fund v. Root,* 59 Fla. 648, 51 So. 535. It is lawful for the Legislature to provide for the use of the Internal Improvement Fund in aid of and for drainage. *Everglades Sugar and Land Company v. Bryan,* 81 Fla. 75, 87 So. 68.

The State of Florida by its Attorney General and the Trustees of the Internal Improvement Fund, by suits filed in the Fifteenth Judicial Circuit against Everglades Drainage District, Lake Worth Drainage District and Napoleon B. Broward Drainage District in January, 1944, sought declaratory de-

▬▬▬▬▬▬▬▬

360

crees that the statutes under which said Districts operated, which required the Trustees to pay drainage district taxes on State owned lands, were unconstitutional. The decisions, both in the Circuit Court and the Supreme Court, were adverse to the contentions of the plaintiffs in those cases. This Court in its opinion on appeal, stated:

"The fact that state lands may be assessed for drainage and that the lien for drainage taxes may be made of equal dignity with the lien for state and county taxes is too well settled to require discussion,"—and

"The lands of the State were included in the tax program on the theory that they should bear their just portion of the burden of reclamation."—State v. Everglades Drainage District, 155 Fla. 403, 20 So. (2nd) 397; State v. Napoleon B. Broward Drainage District, 155 Fla. 407, 20 So. (2nd) 399; State v. Lake Worth Drainage District, 155 Fla. 408, 20 So. (2nd) 399.

The opinion of this Court prepared by Mr. Justice TERRELL in those cases, when studied in connection with the few but pertinent authorities cited in the opinion, demonstrates the sufficiency in law of the alternative writ in this cause. It is of interest to recall that no question was raised concerning the constitutionality of the statute, Chapter 7305, Acts of 1917, which provided that lands sold for nonpayment of Everglades Drainage District taxes should be struck off to the Trustees and that the Trustees should pay Everglades Drainage District taxes on lands held by them. See Judge Strum's opinion in Rorick v. Board of Commissioners of Everglades Drainage District, 57 Fed. (2nd) 1048. This Court construed the statute not to require the Trustees to pay for tax certificates issued upon privately owned land "bid off" to the Everglades Drainage District until such land had been sold or redeemed. State v. Sholtz, 150 So. 878, 112 Fla. 756,

Although no further discussion is required, we cannot refrain from quoting from an annotation styled "Special Assessments"—Public Property"—90 A.L.R. 1146:

"A state clearly has the right, by positive legislative enactment, to declare that its property may be assessed for local improvements, and a constitutional exemption of the property

of the state from 'taxation' does not prevent such a grant. Hassan v. Rochester (1876) 67 N.Y. 528, wherein it was said: "As these are considered under the decisions as benefits to the property assessed, increasing its value, and not as a tax, no valid reason exists why the state, any more than individuals, should be exempted from paying for the advantages conferred. A different rule would compel individual lot owners to pay assessments levied for improvements which were a benefit to the state lands without any adequate advantage, and in many instances impose a burden which would be extremely onerous and produce great injustice. This could not have been intended.' . . . "

There is no reason why the other landowners of the district should bear the burden of paying for the benefit derived and being derived by the Experiment Station lands from the water control works and operations of the District, when the people, speaking through the Legislature, have clearly expressed themselves that the landowners in South Florida Conservancy District should not be so burdened.

Reliance is placed in respondents' brief upon the decision of this Court in the case of Southern Drainage District v. State, 93 Fla. 672, 112 So. 561. That was a suit by the State Board of Education to quiet title to the 16th Section, the title to which had become vested in the State under the provisions of the Act of Congress of the United States of March 3, 1945, 5 Stat. 788. Southern Drainage District had been created by Special Act (7599, Acts of 1917), but the procedure for the levy and enforcement of taxes of the District was the same as that provided by the General Drainage Act, now Chapter 298, Florida Statutes, 1941. The District had levied taxes upon a 16th Section and when the taxes were not paid the section had been included by the district in a suit for foreclosure. The Court in that case did not have before it and did not discuss the levy of taxes upon any lands other than the 16th Section lands.

This case is to be distinguished from the Southern Drainage District case, in that in this case the lands were acquired by the Board of Education after the land had become actually charged with a levy and subject to periodical assessments

thereafter and with a legislative direction to the "Trustees" to pay such. In the Southern Drainage case a sixteenth (16th) section was involved and the rights and exemptions of the Board of Education had already attached before the drainage district was formed—the reverse of the case at bar.

Section 5, Article XII, is not involved, for the statute does not provide for the payment of any money from the School Fund. It directs that payment be made of the taxes by the Trustees of the Internal Improvement Fund.

Since it is not likely that the ordinary process for the enforcement of taxation against public lands is available, mandamus is the proper method of enforcing payment when such lands are subject to taxation.

"Property owned by a county, and held for public purposes, cannot be sold to satisfy the lien of an assessment. Payment of such assessment is to be enforced by proceedings in mandamus, to compel the officers of a county to pay the amount of the assessment out of the county funds; . . . "—Page and Jones on Taxation by Assessment, Vol. 2, Sec. 1075, page 1783.

The motion for peremptory writ notwithstanding the answer is granted.

It is so ordered.

THOMAS, C. J., TERRELL, ADAMS and SEBRING, JJ., concur.

CHAPMAN, J., dissents.