The Honorable H. Lee Moffitt Speaker of the Florida House of Representatives Office of the Speaker Tallahassee, Florida 32301
Dear Representative Moffitt:
This is in response to your request for an opinion on the proposed amendment to the Florida Constitution, commonly referred to as Proposition I, which would limit revenues received by the state and each taxing unit to 1980-1981 revenue dollars plus ad valorem taxes on subsequent construction and annual adjustments of two-thirds of the Consumer Price Index percentage change, provided that the maximum annual adjustment increase for ad valorem taxes is not greater than five percent. While your letter raises numerous questions relating to the proposed amendment, several of your inquiries relate to, and are dependent upon, accounting, clerical or policy decisions which this office cannot resolve; this office can only address questions of law. Other questions are dependent upon the definition of certain critical terms contained in the proposition which this office, when appropriate, will attempt to address. In light of the number of inquiries raised by your letter, this office will address the questions in the order in which they were presented to this office.
QUESTIONS ONE AND TWO
You inquire whether there are multiple subjects in the proposed amendment and whether the language in the preamble of the petition form is sufficient to override the single subject requirement in the State Constitution. See, s 3, Art. XI, State Const., which states in part that the power to propose the revision or amendment of any portion(s) of the State Constitution by initiative is reserved to the people, provided that any such revision or amendment shall embrace but one subject and matter directly connected therewith.
The issue of whether the proposal violates the one subject requirement of the See, Fine v. Firestone, Case No. AT-334 (1 D.C.A. Fla., filed June 27, 1983). It is the longstanding policy of this office to refrain from commenting on issues in litigation before a court of law in this state in order to avoid an unwarranted intrusion into the province of the judiciary. Moreover, it should be noted that this office has no authority to remove any such proposal from the ballot. In addition, the authority of the Attorney General to render legal opinions is limited to public officials on questions relating to their own official duties. See, s 16.01(3), F.S. Since your first two questions concern matters which are presently being litigated and inasmuch as the validity of such an amendment does not appear to be related to your legislative duties, I must decline to render an opinion on these matters.
QUESTION THREE
Your third inquiry concerns the type of local governments which are subject to the revenue limits contained in the proposed constitutional amendment. Paragraph (a) of Proposition I states:
 Revenue received by the state and by each taxing unit for each fiscal period shall be limited to the revenue limit for the preceeding (sic) fiscal period plus the annual adjustment and any ad valorem taxes on improvements due to new construction subject to assessment for the first time. (e.s.)
While the foregoing paragraph refers to `each taxing unit,' such phrase is not defined within the amendment itself. Cf., s132.02(1), F.S., providing that each county, city, town, special road and bridge district, special tax school district, and other taxing units in this state may issue, pursuant to a resolution of its governing body, refunding bonds; and Weigel v. Broward County Port Authority, 10 So.2d 815 (Fla. 1942), wherein the court concluded that the Broward County Port Authority, being a `taxing unit' as contemplated by the refunding act, was such an entity as could refund bonds. And see, Municipal Bond Mortgage Corporation v. Bishop's Harbor Drainage District, 182 So. 794 (Fla. 1938) (drainage district is a taxing district within statute authorizing an action to determine legality of proceedings in connection with bonded debt or certificates of indebtedness). You inquire whether an independent special district which only has the authority to impose service charges or to levy special assessments qualifies as a `taxing unit' within the terms of Proposition I.
Special assessments are charges assessed by a governmental agency or unit against particular parcels of land which have received a special benefit from public improvements; the amount of such assessment is computed by apportioning all or part of the total cost of such improvements among the properties especially benefited. See generally, AGO's 82-80 and 82-9; 29A Fla.Jur. Special Assessments ss 2 and 3. While special assessments are distinguishable from taxes, they are levied under the taxing power and are, in a broad sense, a peculiar species of taxes. See, s 9(a), Art. VII, State Const., which provides that counties, school districts and municipalities shall, and special districts may, be authorized to levy ad valorem taxes and may be authorized by general law to levy other taxes for their respective purposes, except ad valorem taxes on intangible personal property and taxes prohibited by the State Constitution. And see, Jackson v. City of Lake Worth, 23 So.2d 526 (Fla. 1945) (an assessment for benefit, although not strictly a tax, is a burden levied under the power of taxation); State ex rel. Board of Supervisors of South Florida Conservancy District v. Caldwell, 35 So.2d 642 (Fla. 1948) (special assessment is a peculiar species of taxation); Atlantic Coastline R. Co. v. City of Lakeland, 115 So. 669 (Fla. 1927) (assessment for local improvements is part of system of taxation); Anderson v. City of Ocala, 91 So. 182 (Fla. 1922) (power exerted in imposing and collecting special assessments is the taxing power of the state). Cf., 70 Am.Jur.2d Special or Local Assessments s 5. Black's Law Dictionary Tax p. 1629 (Rev. 4th ed. 1968) (in broad sense, taxes undoubtedly include assessments and the *3072 right to impose assessments has its foundation in the taxing power of government; as distinguished from other kinds of taxation, `assessments' are those special and local impositions upon property in the immediate vicinity of municipal improvements which are necessary to pay for the improvement, and are laid with reference to the special benefit which the property is supposed to have derived therefrom).
Thus, special assessments levied under the taxing power, even though not strictly a tax, are in the nature of a tax and would appear to be a special species of tax. A special district, therefore, which has been authorized to levy special assessments under the taxing power would, in my opinion and in the absence of any judicial determination to the contrary, appear to qualify as a `taxing unit' as that term is used in paragraph (a) of Proposition I. Cf., Liberty Oil Co. v. Joy, 150 So. 440 (La.Ct.App. 1933), affirmed sub. nom., Standard Oil Co. of Louisiana v. Joy,153 So. 675 (La. 1934) (in levying and collecting local or special assessments on real property for purpose of paving, surfacing or otherwise improving streets, the city council was acting as a taxing authority).
Your inquiry also concerns whether the imposition of service charges by a local governmental entity constitutes taxation so as to bring the governmental entity within the purview of Proposition I. A considerable question is raised as to whether a district which levies no taxes or has no taxes levied for its services but only imposes service charges may be classified as a `taxing unit.' Generally, rates and charges imposed for goods and services sold or rendered are not considered to be taxes. See generally, 71 Am.Jur.2d State and Local Taxation s 11; 50 Fla.Jur.2d Taxation s 1:13. And see, Contractors Builders Association v. City of Dunedin, 329 So.2d 314 (Fla. 1976), in which the court concluded that an impact or connection fee imposed on new users of the municipal sewer system were not taxes, and recognized a distinction between such fees and special assessments: `The fees in controversy here are not special assessments. They are charges for use of water and sewer facilities; the property owner who does not use the facilities does not pay the fee. Under no circumstances would the fees constitute a lien on realty.'329 So.2d at 319. See also, Turner v. State, 168 So.2d 192 (3 D.C.A. Fla., 1964) (obligation placed on landowners to pay charge for garbage and waste collection and disposal is not a tax but a charge imposed for a special service performed to the owner by the county); Plant City v. Mayo, 337 So.2d 966, 973 (Fla. 1976) (franchise fees are not `taxes'). I am not aware of any judicial determination that such service charges are to be considered taxes, nor has such a decision been brought to my attention. In the absence of judicial or precedential evidence, I cannot conclude that such districts are `taxing units' within the meaning of Proposition I.
QUESTION FOUR
You inquire as to the types of dollar in-flows which are included within the term `revenue.' Paragraph (b)(1) of Proposition I provides that for purposes of the proposed amendment:
 revenue includes ad valorem taxes, other taxes and all other receipts, but excludes receipts from the United States government and its instrumentalities, bonds issued, loans received and the cost of investments sold. Receipts of agencies and instrumentalities and proprietary and trust funds shall be included in the revenue of the state or other taxing unit as appropriate.
`Revenue' is a broad and general term when applied to the income of a government and has generally been defined as `the income of a government from taxation, excise duties, customs, or other sources, appropriated to the payment of the public expenses . . . the collective items or amounts of income of a person, a state . . . the return or yield from any kind of property, patent, service, etc.; income . . . a particular item or source of income.' The Random House Dictionary of the English Language Revenue p. 1226 (Unabridged ed. 1967). And see, Webster's Third International Dictionary Revenue p. 1942 (Unabridged ed. 1966) (public income of whatever kind); Black's Law Dictionary Revenue p. 1482 (Rev. 4th ed. 1968) (as applied to income of a government, a broad and general term, including all public moneys which the state collects and receives from whatever source and in whatever manner; the income which a state collects and receives into its treasury and is appropriated for the payment of its expenses).
In defining the term `revenue,' Proposition I expressly `includes . . . all other receipts.' Cf., Argosy Ltd. v. Hennigan,404 F.2d 14 (5th Cir. 1968) (term `includes' is a term of enlargement and not limitation, and conveys conclusion that there are other items includable, though not specifically enumerated by statute). The term `receipts' is also broadly defined. See, e.g., The Random House Dictionary of the English Language Receipt(s) p. 1198 (Unabridged ed. 1967) (the amount or quantity received); Webster's Third International Dictionary Receipt p. 1894 (Unabridged ed. 1966) (something [as food, goods, money] that is received); Black's Law Dictionary Receipt p. 1433 (Rev. 4th ed. 1968) (act of receiving; that which comes in, in distinction from what is expended, paid out, sent away and the like). And see, 75 C.J.S. Receipt p. 642 stating that `[f]requently the word [receipt] is employed in the plural, as in the term `gross receipts' and when so used it signifies that which is received; . . . . `Receipts' has been held equivalent to, or synonymous with, `income' . . . .'
In construing a constitutional provision, the purpose should be to ascertain and effectuate the intent and object designed to be accomplished. See, e.g., State v. Butler, 69 So. 771 (Fla. 1915); Gray v. Bryant, 125 So.2d 846 (Fla. 1960). And see, Williams v. Smith, 360 So.2d 417 (Fla. 1978) (in analyzing constitutional amendment adopted by initiative rather than by legislative or Constitution revision commission vote, intent of framers should be accorded less significance than intent of voters as evidenced by materials they had available as a predicate for their collective decision). The words and terms used in constitutional provisions are to be interpreted in their usual and obvious meaning. See, Florida Boaters Association, Inc. v. State, Department of Revenue,400 So.2d 1006 (1 D.C.A. Fla., 1981), affirmed and remanded,409 So.2d 17 (Fla. 1981); City of St. Petersburg v. Briley, Wild 
Associates, Inc., 239 So.2d 817, 822 (Fla. 1970) (if constitutional language is clear and not entirely unreasonable or illogical in its operation, court has no power to go outside bounds of constitutional provision in search of excuses to give a different meaning to words used therein); Plante v. Florida Commission on Ethics, 354 So.2d 87, 89 (1 D.C.A. Fla., 1977) (when provisions of Constitution, as adopted by citizenry of Florida, are clear and unambiguous, they are to be read and enforced as written). And see, Ervin v. Collins, 85 So.2d 852 (Fla. 1956) (Supreme Court, in construing purposes of Constitution, is to effectuate purpose of the people from words employed in Constitution and is not permitted to color Constitution by addition of words or engrafting Court's views as to how it should have been written). See generally, Graham v. State, 362 So.2d 924
(Fla. 1978) (generally words in statute should be given their plain and ordinary meaning); State v. Stewart, 374 So.2d 1381
(Fla. 1979) (when statute does not specifically define words, such words should be construed in their common or ordinary sense); and State ex rel. McKay v. Keller, 191 So. 542 (Fla. 1939); Mugge v. Warnell Lumber v. Veneer Co., 50 So. 645 (Fla. 1909) to the effect that the rules used in construing statutes are also applicable in the construction of the Constitution. And see, State v. City of Jacksonville, 50 So.2d 532 (Fla. 1951) (where statute to be construed is couched in broad, general and comprehensive terms and is prospective in nature, it may be held to apply to situations, cases, conditions, things, subjects, methods, persons or entities coming into existence since statute's enactment provided that they are in same general class as those treated in statute, can be reasonably said to come within statute's general purview, scope, purpose and policy and there is nothing in statute indicating intention that they should not be included); Florida State Racing Commission v. McLaughlin, 102 So.2d 574 (Fla. 1958); Florida Industrial Commission v. Growers Equipment Co., 12 So.2d 889 (Fla. 1943); 30 Fla.Jur. Statutes s 81 (use by Legislature of broad and comprehensive term indicates intent to include everything embraced within the generality of such a comprehensive term).
Thus, the terms `revenue' and `receipts' are broadly defined and would appear to encompass all income from whatever source received by the state or local taxing unit except as limited by the proposition itself, i.e., receipts from the United States government and its instrumentalities, bonds issued, loans received and the cost of investments sold. In defining revenue, however, paragraph (b)(1) provides that receipts of (state and local) agencies and instrumentalities and proprietary and trust funds shall be included in the revenue of the state or local taxing unit. Although a literal reading of this language would support a conclusion that receipts of state or local trust funds or proprietary funds from whatever source, internal as well as external, would be included as revenue, in view of the foregoing definitions of revenue and receipts which appear to contemplate an inflow to the state (or the local taxing unit) and in light of the expressed intent of the proposition to limit revenue received by
the state and each local taxing unit, I am of the opinion, until and unless judicially determined otherwise, that the transfer of funds internally by the state or by a local taxing unit are not included within the definition of revenue as provided in paragraph (b)(1). Thus, it is my opinion that revenue received by the state and each taxing unit refers to revenue received from external sources and does not refer to any internal transfer of funds.
Thus receipts of, or monies received by, trust funds, or proprietary funds, and funds received from royalties, receipts from land leases and from the sale of state lands, interest earnings, including pension fund earnings, tuition payments, dormitory fees, and receipts of bookstores would be included within Proposition I's definition of revenue provided that such receipts or monies received by the state or local taxing unit do not constitute internal transfers between funds within the state or local taxing unit. As to those monies deposited in the Workers' Compensation Administration Trust Fund, such payments are assessed by the affected state agency against insurance carriers and self insurers and are used for payment of all expenses for the administration of the Workers' Compensation Law, Ch. 440, F.S. Seegenerally, s 440.50(1)(a) and 440.51(1)(b), F.S. Although s440.50, F.S., which establishes the `Workers' Compensation Administration Trust Fund' as a special fund in the State Treasury, declares that such monies shall not be the money or property of the state (see also, s 440.49[h]1, F.S., establishing the `Special Disability Trust Fund' which contains similar language), for purposes of Proposition I and in light of its expressed purpose and intent, I am compelled to conclude that despite the language contained in s 440.50(1)(a), such revenues are subject to the revenue limits prescribed in Proposition I.
You also inquire whether monies paid into the Unemployment Compensation Trust Fund, pension fund contributions and receipts used to finance the state's health self insurance program constitute revenue for the purposes of Proposition I. As to those contributions to the Unemployment Compensation Trust Fund which are collected by the state and immediately deposited with the Secretary of the Treasury of the United States and subsequently requisitioned by the state for benefits as prescribed by Ch. 443, F.S., the Unemployment Compensation Law, and for payment of expenses, see s 443.191, F.S., such funds would not, in my opinion, be subject to Proposition I. See, paragraph (b)(1) of Proposition I which expressly excludes from the definition of revenue receipts from the United States government and its instrumentalities. To the extent, however, that the state and its agencies collect interest on late payments or contributions or any penalties collected for failure to file any report required by the state agency in administering Ch. 443 which are not deposited into the federal treasury, such interest and penalties would appear to be subject to the limitations of Proposition I.
With respect to the state retirement system, such system is now noncontributory. In view of the fact that any money paid into the fund by agencies of the state from properly appropriated and budgeted funds do not constitute revenues received from any external source, such contributions are not within the purview of Proposition I. As to those contributions made to the Florida Retirement System or any local retirement system by local governments, it would not appear that such payments constitute the receipt of revenues from any external source and therefore would not be within the purview of Proposition I; however, to the extent that contributions to a local retirement system are made by the public employees, such contributions would appear to be receipts and thus be included as revenue within the meaning of Proposition I. Finally, with respect to contributions by participating state employees in the state's health program, I am of the view that such payments constitute receipts within the definition of revenue contained in paragraph (b)(1) of the proposition; however, to the extent that such contributions are paid by agencies of the state from properly appropriated and budgeted funds, such monies do not constitute revenues received from any external source and would not therefore come within the purview of Proposition I. Such items as social security contributions and withholdings for federal income taxes would not, in my opinion, constitute revenue since such funds do not constitute income received by the state or a local taxing unit for payment of its expenses but rather are collected on behalf of and withheld for the federal government. This office cannot, however, categorize each and every source of monies received by the state or a taxing unit as to whether such monies are or are not to be considered revenue within the purview of Proposition I except to note that the definitions of revenue and receipts as used in Proposition I are extremely broad and would appear to encompass all funds received by the state forpayment of its expenses.
You also inquire whether intergovernmental revenue from the state to a local government would be counted as part of the state's limit, the local government's limit or both. I note that receipts from the United States government and its instrumentalities are expressly excluded from the definition of `revenue.' With regard to those funds from the state to a local government, to the extent that the state receives revenue, any part of which is to be appropriated and transferred to local governments, under the foregoing definitions of `revenue' and `receipts' I am of the opinion that the state has received revenue for purposes of Proposition I. As to any such revenues appropriated and transferred through any authorized state program to local governments, such monies would constitute revenue received from external sources by a local government and would come within the meaning of paragraph (a) of Proposition I.
QUESTION FIVE
Paragraph (b)(1) of Proposition I in defining `revenue' states in PERTINENT part:
 Receipts of agencies and instrumentalities and proprietary and trust funds shall be included in the revenue of the state or other taxing unit as appropriate. (e.s.)
You inquire whether the phrase `as appropriate' modifies `state or other taxing unit,' `receipts' or `shall be included.' Under the `doctrine of the last antecedent,' relative and qualifying words, phrases and clauses are to be applied to the words or phrase immediately preceding and are not to be construed as extending to other words or phrases more remote or to following words. 82 C.J.S. Statutes s 334. Cf., Mallard v. Tele-Trip Co.,398 So.2d 969 (1 D.C.A. Fla., 1981). While this rule is merely an aid to construction and will not be applied when the clear intent of the statute (or Constitution, cf., State ex rel. McKay v. Keller, supra, [rules used in construing statutes also applicable to construction of Constitution]) is to the contrary, I cannot say that in the instant inquiry such a contrary intent is present. Rather, the phrase `as appropriate' would appear to be applicable, both under the doctrine of the last antecedent and from my plain reading of the proposed constitutional provision, to the phrase `state or other taxing unit.' Such an interpretation is consistent with the overall purpose of the proposed amendment, i.e., to limit the revenues received by the state and by each taxing unit. Under such an interpretation, the receipts collected by a governmental entity will be included as a part of the revenue of whichever level or unit of government the collecting governmental entity is a part, whether the state or a local taxing unit.
Accordingly, I am of the opinion, until and unless judicially determined to the contrary, that the phrase `as appropriate' contained in paragraph (b)(1) of the proposed constitutional amendment modifies `state or other taxing unit.'
QUESTION SIX
In defining the term `revenue,' paragraph (b)(1) of the proposed constitutional amendment provides in part that `[r]eceipts of agencies and instrumentalities and proprietary and trust funds shall be included in the revenue of the state or other taxing unit as appropriate.' You inquire as to the meaning of `proprietary' funds and ask whether all enterprise operations or municipally owned utilities are included within the term.
As a noun, the word `proprietary' generally refers to an owner or one who has the exclusive title to a thing; as an adjective, the word has been defined as `belonging or pertaining to a proprietor [or] relating to a certain owner or proprietor.' Black's Law Dictionary Proprietary p. 1384 (Rev. 4th ed. 1968). And see, Black's Law Dictionary Proprietor p. 1384 (Rev. 4th ed. 1968) (one who has the legal right or title to anything; in many states, synonymous with owner); 73 C.J.S. Proprietary and Proprietor pp. 218 and 219, respectively. When such term has been applied to the operations or functions of a governmental entity as, for example, a municipality, it has been stated that a municipality, when acting in a proprietary or municipal capacity, acts for the private advantage of the inhabitants of the city and for the city itself and not as a sovereign or in a legislative capacity and is governed by the rules pertaining to private individuals or corporations. 62 C.J.S. Municipal Corporations s 110c; City of Lakeland v. State ex rel. Harris, 197 So. 470, 472 (Fla. 1940). Daly v. Stokell, 63 So.2d 644, 645 (Fla. 1953); State v. City of Riviera Beach, 397 So.2d 685, 687-688 (Fla. 1981). Similarly, a state may hold property in a proprietary capacity and when acting in a proprietary capacity as an owner of property, it is governed by the same rules as those which it applies to its citizens. See, 81A C.J.S. States s 145; and see, State v. Stoutamire,179 So. 730, 733 (Fla. 1938).
In considering what constitutes a proprietary function, the courts have stated that the factors to be considered include whether the function could be performed as well by a private corporation, whether the municipality (or other public entity) derives a profit or merely some benefit or advantage from the enterprise, and whether the function concerns the sale of a commodity or service, establishing the relationship of seller and purchaser. See, Leemon v. South Jersey Port Commission, 145 F. Supp. 828 (D.C. N.J. 1956), in which the court concluded that the operation of a pier on a river by a port district was a proprietary function. And see, Shealor v. Ruud, 221 So.2d 765 (3 D.C.A. Fla., 1969) (rule distinguishing governmental function from proprietary function is difficult to formulate but factor to be considered in determining whether function of a municipality is proprietary is whether function could be performed as well by private corporation); State v. Musgrave, 370 P.2d 778, 782 (Idaho 1962) (state insurance fund created for purpose of carrying on a proprietary function as distinguished from a government function; it serves a public purpose but not a governmental purpose).
Thus, operations such as the management of a waste supply system or public utility plant have been considered by the courts to be proprietary functions. See, e.g., City of Treasure Island v. Decker, 174 So.2d 756 (2 D.C.A. Fla., 1965) (operation of toll facility by municipality); Town of Riviera Beach v. State,53 So.2d 828 (Fla. 1951) (water supply system); State v. City of Riviera Beach, 397 So.2d 685 (Fla. 1981) (undertaking by municipality of an industrial development project is exercise of proprietary power rather than sovereign power); City of Lakeland v. State, supra (sewage disposal plant); Chardkoff Junk Co. v. City of Tampa, 135 So. 457 (Fla. 1931) (garbage disposal). Andsee, 12 McQuillin Municipal Corporations s 35.27 (operation and management of public utility plant is not exercise of municipality's governmental or legislative powers but of its business powers). Cf., Stringfield v. City of Hackensack,171 A.2d 361, 365 (N.J. 1961) (operation of municipal owned metered parking lot is a proprietary function); Spomer v. City of Grand Junction,355 P.2d 960, 963 (Colo. 1960) (operation of cemetery by city is a proprietary function); Gee Gee Realty Corp. v. District of Columbia, 200 A.2d 378, 379 (Dist. Col. 1964) (construction and maintenance of sewer system is a proprietary function); Holt v. Bowie, 333 F. Supp. 843, 845 (D.C. Va. 1971) (operation of electric light and power utility); City of Troy v. McLendon, 188 So.2d 281,282 (Ala. 1966) (operation of city owned electrical distribution system is proprietary business function); Obitz v. Airport Authority of City of Red Cloud, 149 N.W.2d 105, 110 (Neb. 1967) (operation of airport authority of city is proprietary activity even though airport authority is a public corporation engaged in a public purpose); City of Tulsa v. Davis, 376 P.2d 282, 284 (Okla. 1962) (maintenance and repair of sewers by city).
Based upon the foregoing, enterprise operations and municipally owned utilities would appear to be included within the term of `proprietary.' Thus, the receipts from such operations would be included in the revenue of the state or local taxing units pursuant to paragraph (b)(1) of Proposition I.
QUESTION SEVEN
You inquire how the percentage change in the consumer price index (CPI) for the preceding calendar year should be measured. You specifically mention calculating such change (assuming that the preceding year is 1984) by (1) the average of the 12 monthly indices for 1984 divided by said average for 1983, or (2) the December 1984 index divided by the December 1983 index, or (3) the December (31) 1984 index divided by the January (1) 1984 index.
Such an inquiry does not raise a question of law which may be resolved by this office. I note, however, that the pertinent provisions of the proposed amendment specifically state that the annual adjustment for each fiscal period shall be the revenue limit of the preceding fiscal period times two-thirds of the percentage change in the Consumer Price Index for all Urban Consumers, U.S. City Average, All Items 1967-100, or successor reports, for the preceding calendar year, as initially reported bythe United States Department of Labor, Bureau of Labor Statistics. Paragraph (b)(2). While the proposition only refers to the percentage change in the CPI for the preceding calendar year and not to the average of such change for the previous 12 months, I note from information supplied to this office that the Department of Labor, Bureau of Labor Statistics, in its January monthly consumer report publishes the figures for the changes in the CPI for the previous twelve months by calculating the December to December index and by calculating the average of the 12 monthly indices for the last twelve months divided by said average for the year preceding the last twelve months. Both figures are available through the Department of Labor's consumer report. It has been reported to this office that the Department of Labor does not calculate the percentage change in the CPI according to the third method set forth in your letter. As previously stated, however, this office cannot, as a matter of law prescribe or recommend the manner in which such a percentage change should be calculated.
QUESTION EIGHT
In the event that revenues are collected in excess of the limit, you inquire how subsequent rate reductions are to be made. Paragraph (c) of Proposition I states that `[r]evenue collected in excess of a revenue limit shall be placed in escrow until the following fiscal period, in which period it shall be deemed revenue received, and applicable rates shall be reduced in an amount reasonably calculated to comply with the revenue limits of the section.' (e.s.)
I must again decline to specify a particular method for reducing the applicable rates. Such is a determination which must be made by the Legislature or the legislative and governing body of a local taxing unit as the case may be. This office can only state that any such method chosen must be reasonable and calculated to reduce the applicable rates to bring the revenues received within the revenue limits prescribed by the proposed constitutional amendment. See generally, Black's Law Dictionary Reasonable p. 1431 (Rev. 4th ed. 1968) ('[f]it and appropriate to the end in view . . . not immoderate or excessive, being synonymous with rational . . . . As applied to rates of public service companies, a reasonable rate is one not so low as to be destructive of the company's property or so high, either intrinsically or because discriminatory, as to be an unjust exaction from the public'); 75 C.J.S. Reasonable p. 635 (when employed to describe the means used to achieve a legitimate end, it suggests not necessarily the best or only method but one fairly appropriate, at least under all circumstances and when used in connection with legislative measures it signifies such measures as are fit and appropriate to the end in view).
What constitutes a reasonable method for reducing rates, however, is a decision which must initially be made by the Legislature or the legislative and governing body of a local taxing unit since this question actually involves the exercise of legislative judgment. Neither the Legislature nor the legislative and governing body of a local taxing unit may delegate such legislative functions and determinations to the Attorney General nor may this office undertake to make such legislative findings and determinations for the Legislature or local legislative board or body.
QUESTION NINE
You inquire as to how reductions in revenue sources not dependent on a rate are to be made. As discussed in the previous question, paragraph (c) requires that when revenue in excess of the revenue limit has been collected, applicable rates must be reduced to conform to the revenue limits prescribed in Proposition I.
Your inquiry appears to arise from some confusion over the term `rate.' The term `rate' is not a technical term with a fixed meaning. See, e.g., 75 C.J.S. Rate pp. 607-608 (a flexible term of which many definitions are to be found, sometimes defined as price, charge, or payment). And see, Webster's Third International Dictionary Rate p. 1884 (Unabridged ed. 1966); Black's Law Dictionary Rate pp. 1427-1428 (Rev. 4th ed. 1968) (proportional value, measure or degree; in connection with public utilities, a charge to the public for a service open to all and upon the same terms; the term is also used as a synonym of tax and sometimes occurs in a connection which gives it a meaning synonymous with `assessment'). Thus, the word has no single fixed meaning but may be used to encompass any and all assessments, fees, prices, charges, taxes and payments made to the state or local taxing unit. As stated in the previous question, this office cannot specify a particular method by which applicable rates are to be reduced; such is a determination which must be made by the Legislature or the legislative body of the local taxing unit; this office can only state that whatever method is selected by the Legislature or the local legislative board or body, it must be reasonably calculated to comply with the revenue limits prescribed in Proposition I.
QUESTION TEN
You ask whether reductions in revenue sources must attempt to fully delete a previous year's surplus in the first upcoming year or whether such a reduction of the surplus can be spread over a longer period of time.
Paragraph (c) expressly states that revenue collected in excess of the revenue limits `shall be placed in escrow until the following fiscal period, in which period it shall be deemed revenue received, and applicable rates shall be reduced in an amount reasonably calculated to comply with the revenue limits of this section.' (e.s.) Cf., Florida Tallow Corp. v. Bryan, 237 So.2d 308
(4 D.C.A. Fla., 1970) (word `shall' has, according to its normal usage, a mandatory connotation); Brooks v. Anastasia Mosquito Control District, 148 So.2d 64 (1 D.C.A. Fla., 1963). Thus under the foregoing provision, surplus revenue must be placed in escrow until the following year at which time it is to be considered as revenue received and, because of the increase in revenue received by the state or local taxing unit caused by the surplus, the rates of revenue sources are to be reduced in order to meet the limits placed upon revenue received by the state or taxing unit. The provision does not, however, provide for, or otherwise appear to contemplate, that surplus funds be spread over a period of several years.
It is well established that when the Constitution prescribes the manner of doing something, it impliedly forbids its being done in a substantially different manner. See, e.g., In re Advisory Opinion of Governor Civil Rights, 306 So.2d 520 (Fla. 1975); Advisory Opinion to Governor, 22 So.2d 398 (Fla. 1945); Weinberger v. Board of Public Instruction, 112 So. 253 (Fla. 1927). Since the proposed constitutional provision provides a method whereby excess revenue will be considered as revenue the following year, the constitutional amendment under the foregoing rule of construction impliedly forbids that such funds be handled in a substantially different fashion such as spreading the surplus over a period of several years. Accordingly, I am of the opinion that reductions in revenue sources cannot be spread over a period of several years.
QUESTION ELEVEN
You inquire as to the level of effort that is necessary to comply with the `reasonably calculated' requirement of paragraph (c). As discussed in Question Eight, this office cannot prescribe or specify what method the Legislature or the legislative and governing body of a local taxing unit should employ nor can this office opine upon the `level of effort' required in order to meet the standard set forth in the proposed constitutional provision. Such an inquiry is not a question of law which can be resolved by this office. I can only state that the Legislature or the governing body of a local taxing unit as the case may be is under a responsibility to do whatever is reasonable to bring the state or local taxing unit within the revenue limits prescribed by the constitutional amendment.
QUESTION TWELVE
Paragraph (d) provides in part that when authorized by vote of a taxing jurisdiction:
 (1) revenue limits may be exceeded for specified purposes and amounts, for not longer than two fiscal periods;
 (2) revenue limits may be exceeded to provide for principal and interest payments on designated bonds for specified purposes.
You inquire as to the degree of specificity that is required under the foregoing provision. The term `specify' and its generic derivations have generally been defined to mean named, mentioned or stated precisely or in detail. See, 81A C.J.S. Specified p. 218-219 (particularized, specifically named, mentioned or named in a specific manner or told or stated precisely or in detail); Black's Law Dictionary Specific p. 1571 (Rev. 4th ed. 1968) (to make particular, definite, limited or precise); Webster's Third International Dictionary Specify p. 2187 (Unabridged ed. 1966) (to mention or name in a specific or explicit manner; to state precisely or in detail). And see, 39A Words and Phrases Specified
pp. 467-468, and Specify pp. 469-471. Clearly, the proposal presented to the electorate for approval should be specific enough to notify the elector what he is voting on. Cf., 29 C.J.S. Elections s 170 (a ballot by which a question or proposition is submitted to electorate must be in such proper form that the voter will have at hand some means for making up his mind whether to vote to approve or disapprove; ballot must be free from uncertainty or ambiguity and must not be misleading); Hill v. Milander, 72 So.2d 796, 798 (Fla. 1954). And see, s 101.161, F.S., requiring an explanatory statement of the chief purpose of a public measure submitted to the *3078 electorate to be printed in clear and unambiguous language on the ballot.
The proposed constitutional amendment states that the revenue limits may be exceeded under certain prescribed circumstances for specified purposes when authorized by vote of the electorate. In light of the foregoing definitions, I cannot state that such generalized terms as general operations, crime control, service level continuation or service quality improvements are sufficiently definite or specific to meet the requirements set forth in Proposition I.
You also inquire whether multiple purposes may be included in a single ballot issue. While multiple purposes may be included within a single election, in light of the language of paragraph (d) it is my opinion that such purposes should be contained in separate propositions. Cf., 29 C.J.S. Elections s 170 stating that two or more propositions may be submitted on the same ballot provided the voter is given the opportunity to vote for or against each question submitted separately and independent from his vote for or against the other propositions submitted since `it is well settled that two or more distinct propositions cannot be submitted as a single question.' See also, 29 C.J.S. Elections s 79. Andsee, State v. Dade County, 39 So.2d 807 (Fla. 1949); State v. Thompson, 163 So. 270 (Fla. 1935); AGO's 79-20 and 71-109. Cf., s101.161, F.S., requiring that whenever a public measure is submitted to the vote of the people, the substance of such public measure or explanatory statement of the chief purpose of the measure shall be printed in clear and unambiguous language on the ballot.
QUESTION THIRTEEN
Paragraph (e) of the proposed amendment provides that revenue limits may be exceeded to the extent necessary to avoid impairment of obligations of contracts and bonds existing on the effective date of the amendment. You inquire as to the construction of the term `obligations of contracts' as used in paragraph (e), specifically whether a government prior to the amendment's effective date can contract with certain organizations (presumably nonofficial or private) to provide an adequate level of governmental services, as subsequently determined by the Legislature; to maintain the quality of governmental services per capita at the level existing prior to the effective date of Proposition I; to maintain revenue flows or tax rates at specified minimum levels or rates of growth; to raise sufficient funds to pay private organizations to provide certain governmental-type services on a cost-plus basis, and be subject to the exclusion in paragraph (e).
These abstract questions and functions would appear to involve and relate to the legislative and governmental powers of the state and the local governments or taxing units. Generally, legislative and governmental powers are by nature nondelegable and may not be contracted away or delegated to private persons, organizations, or corporations. See, e.g., Adoue v. State, 408 So.2d 567, 570 (Fla. 1981); Rosslow v. State, 401 So.2d 1107, 1108 (Fla. 1981); Bradford County, Florida v. Nuveen, 133 F.2d 169 (5th Cir., 1943); Dade County v. State, 116 So. 72 (Fla. 1928); Crandon v. Hazlett,26 So.2d 638 (Fla. 1946); City of Miami Beach v. Fleetwood Hotel, Inc., 261 So.2d 801, 805 (Fla. 1972); Early Mobile Homes, Inc. v. City of Port Orange, 299 So.2d 56 (1 D.C.A. Fla., 1974). While the Legislature may delegate its nonlegislative function, the exercise of its discretion as to what the law shall be cannot be delegated; thus the Legislature cannot delegate its power to tax or to fix the tax rate, to appropriate money or any other fundamental or basic power. See generally, 16 C.J.S. Constitutional Law s 133; 84 C.J.S. Taxation s 8 (generally power of taxation existing exclusively in the Legislature cannot be delegated); Cassady v. Consolidated Naval Stores Company, 119 So.2d 35 (Fla. 1960) (statute providing for separate taxation of mineral rights in certain instances but providing that the special assessment of such rights by the tax assessor should be required only when the owner of some record interest in the land filed a written request for such separate assessment constituted an unauthorized delegation of legislative power and was unconstitutional); Whitney v. Hillsborough County, 127 So. 486 (Fla. 1930) (any action that amounts to abdication of legislative function of taxation is obnoxious to Constitution). Thus, questions as to the mode, character or extent of taxation, apportionment, means of assessment and collection, and all other incidents of the taxing power are for the Legislature to decide. 50 Fla.Jur.2d Taxation s 5:4 And see, City of Clearwater v. Bonsey, 180 So.2d 200 (2 D.C.A. Fla., 1965), in which the court held that the duty imposed on county to regulate and revise water rates could not be divested by contract; City of Naples v. Conboy, 182 So.2d 412 (Fla. 1965) (contract and ordinances extending tax benefits to private developer invalid and unenforceable). And see, Dade County v. State, 116 So. 72 (Fla. 1928); City of Miami Beach, Fla. v. State,116 So. 480 (Fla. 1928) (Constitution does not contemplate essential governmental power or authority may be exercised by corporate agency whose officers are not duly commissioned officers).
Moreover, in interpreting any constitutional provision, the purpose or intent should be ascertained and effectuated, see, State v. Butler, supra; Gray v. Bryant, supra. Thus in construing a constitutional provision, it is proper to consider the circumstances which led to its adoption and the purpose to be accomplished. State v. Bryan, 39 So. 929 (Fla. 1905); State v. Florida State Improvement Commission, 60 So.2d 747 (Fla. 1952); Plante v. Smathers, 372 So.2d 933 (Fla. 1979).
From my examination of the proposed constitutional amendment, it appears clear that the intent of the proposition is to limit the revenues received, and expenditures made, by the state and local taxing units. To permit a government to avoid such limitations by entering into binding agreements with private organizations prior to the effective date of the amendment to perform the above listed governmental functions and services would effectively emasculate, if not nullify, this constitutional provision and would appear to be contrary to its intent and purpose. Cf., Green v. Galvin,114 So.2d 187 (1 D.C.A. Fla., 1959) (public official cannot do indirectly that which he is prohibited from doing directly); Solomon v. City of Miami Beach, 187 So.2d 373 (3 D.C.A. Fla., 1966), cert. denied, 196 So.2d 927 (Fla. 1967). Accordingly, in the absence of any judicial direction on this issue, this office cannot approve such an arrangement or state that a government may lawfully enter into such agreements as contemplated in your inquiry.
QUESTION FOURTEEN
Your final inquiry concerns whether the recovery costs and attorney fees granted to a taxpayer under a suit for enforcement of the amendment are `outside the revenue limits.' See, paragraph (f) of the proposed constitutional amendment stating that `[a]ny taxpayer of the state shall have standing to bring suit to enforce this section and, if successful, shall recover costs and attorney fees from the taxing jurisdiction.'
Paragraphs (d) and (e) of Proposition I set forth those circumstances in which revenue limits may be exceeded. Such provisions do not, however, create or refer to an exception for the payment of costs and attorney fees. Under the rule of construction `expressio unius est exclusio alterius,' where a statute or Constitution enumerates the things on which it is to operate or forbids certain things, it is ordinarily to be construed as excluding from its operation all those not expressly mentioned. See, e.g., Thayer v. State, 335 So.2d 815 (Fla. 1976); Interlachen Lakes Estates, Inc. v. Snyder, 304 So.2d 433 (Fla. 1974); In re Advisory Opinion of Governor Civil Rights,306 So.2d 520 (Fla. 1975); Dobbs v. Sea Isle Hotel, 56 So.2d 341 (Fla. 1952).
Applying the rule to the instant inquiry, it appears that as the recovery costs and attorney fees granted to a taxpayer under suit for enforcement of the amendment are not included within the provisions authorizing revenue limits to be exceeded and no provision states that such costs and fees shall be considered `as outside the revenue limit,' no such exception may be implied. I am therefore of the opinion that the recovery costs and attorney fees granted to a taxpayer under a suit for enforcement of the amendment are not outside the prescribed revenue limits.
In sum, I am of the opinion until and unless judicially determined otherwise,
 1) Since the question as to whether the proposed constitutional amendment, referred to as Proposition I, contains multiple subjects and the language in the preamble of the petition form meets constitutional requirements is presently before the courts and inasmuch as the validity of such amendment does not appear to be related to any official legislative duty, this office must decline to render an opinion on these issues.
 2) Since special assessments are levied under the taxing power and are in the nature of a tax or a special species of tax, a special district which has been authorized to levy only special assessments would qualify as a taxing unit as that term is used in the proposed constitutional amendment; however, since rates and charges imposed for goods or services sold or rendered are generally not considered to be taxes or special assessments, a special district authorized only to impose such charges for services rendered would not be a `taxing unit' within the purview of Proposition I.
 (3) The term `revenue' as used in the proposed amendment is broadly defined and would appear to encompass all income from whatever source received by the state or local taxing unit except as limited by the proposition itself. The transfer of funds internally by a state agency or by a local taxing unit, however, are not included within the definition of revenue provided in paragraph (b)(1); rather, revenue received by the state and each taxing unit refers to revenue received from external sources and does not include internal transfers of funds. In addition, funds such as social security contributions and withholdings for federal income taxes would not constitute revenue or income since they are not collected by the state or local taxing unit for payment of its expenses, but rather are collected on behalf of and withheld for the federal government.
 4) The phrase `as appropriate' contained in paragraph (b)(1) of the proposed constitutional amendment modifies `state or other taxing unit.'
 5) Enterprise operations and municipally owned utilities are included within the term `proprietary' as used in paragraph (b)(1) of the proposition; thus receipts from such operations would be included in the revenue of the state or local taxing units.
 6) This office cannot recommend a method for measuring the percentage charge in the consumer price index provided in paragraph (b)(2) of Proposition I; such an issue is not a question of law which may be resolved by this office.
 7) This office cannot, as a matter of law, prescribe a particular method for reducing applicable rates when revenue in excess of the revenue limit has been collected except to state that the method chosen must be reasonable and calculated to reduce such rates so as to bring the revenues received within the *3080 limits prescribed by the proposed constitutional amendment.
 8) The term `rate' is a flexible term and as used in Proposition I would appear to encompass any and all assessments, fees, prices, charges, taxes and payments made to the state or a local taxing unit.
 9) Since Proposition I provides a method whereby excess revenue will be treated as revenue the following year and applicable rates reduced in order to comply with the revenue limits of the amendment and does not provide for or contemplate that such a surplus be spread over a period of several years, such reductions in revenue sources cannot be spread over a period of several years.
 10) This office cannot opine upon the `level of effort' required in order to meet the standards set forth in the proposed constitutional provision except to state that the Legislature or the governing body of a local taxing unit is under a responsibility to do whatever is reasonable to bring the state or local taxing unit within the revenue limits prescribed by the constitutional amendment.
 11) This office cannot state that generalized terms such as general operations, crime control, service level continuation or service quality improvements are sufficiently definite or specific to meet the requirements of Proposition I which provide that revenue limits may be exceeded under certain prescribed circumstances for specified purposes when authorized by vote of the electorate.
 12) The provision of adequate levels of governmental services, the maintenance of the quality of government services per capita, maintaining revenue flows or tax rates at specified levels or rates of growth and the raising of sufficient funds to pay private organizations to provide governmental-type services on a cost-plus basis would appear to involve the exercise of the nondelegable legislative and governmental power of the state and the local governments or taxing units, and may not be contracted away or delegated to private organizations. To permit a government to avoid the revenue limits contained in Proposition I by entering into binding agreements prior to the effective date of the amendment with private organizations to perform such functions or provide such services would appear to be contrary to the amendment's intent and purpose and this office cannot approve such an arrangement or state that a government may enter lawfully into such an agreement.
 13) Recovery costs and attorney fees granted to a taxpayer under a suit for enforcement of the constitutional amendment are not outside the prescribed revenue limit.
Sincerely,
Jim Smith, Attorney General
Prepared by: Joslyn Wilson, Assistant Attorney General